**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Optimistic Investments LLC, et al.,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>Kangaroo Manufacturing Incorporated, et al.,<br><br>　　　　　　Defendants. | No. CV-21-02212-PHX-MTL<br><br>**ORDER** |

　　　　This case is about copyright disputes over products sold on Amazon.com ("Amazon"). Defendant Justin Ligeri has filed over 200 Amazon complaints regarding Plaintiffs' use of copyrighted images and packagings of products which he claims he or one of his entities own. Ligeri's complaints have impaired Plaintiffs' ability to sell on Amazon. Plaintiffs assert that they own the copyrights in question, and move for a temporary restraining order ("TRO") requiring Ligeri to withdraw his prior complaints and barring him from filing new ones. (Doc. 14.) The Court held a two-day evidentiary hearing. For the following reasons, the Court grants the TRO and denies the request for an order to show cause.

**I.　　BACKGROUND**

　　　　This case presents a gordian knot of facts twisted around a central question: who owns the subject copyrights, and other intellectual property rights, for certain products sold on Amazon. Plaintiffs Optimistic Investments, LLC ("Optimistic"), owned by Joshua Tischer; OIG Brand Management, LLC ("OIG"), owned by John Burns; and Michael S.

Murphy have an extensive business and personal history with Defendants Kangaroo Manufacturing, Inc. ("Kangaroo") and its owner Justin Ligeri. Plaintiffs and Ligeri testified that they have also conducted business through and with Ligeri's other companies—Cheyenne Brands Holdings, LLC ("Cheyenne") and Kbrands, LLC ("Kbrands")—and with Tischer's other company, Lightning Quick, LLC ("Lightning"). The Amazon seller accounts FBA King, Toy-Time, Fun-Raiser, Over the Moon, Front Porch, Divine, and Crazy Games have been used to sell the subject products on Amazon. (Admitted as Plaintiffs' Exhibit 18.). Finally, the parties testified that they have also done business with the many subsidiaries of Lightning, Optimistic, Kangaroo, Cheyenne, and OIG.

The parties have entered into numerous agreements involving the intellectual property rights at issue. On May 30, 2019, Kangaroo and Optimistic executed an "Assignment and Reseller Agreement."[1] (Admitted as Plaintiffs' Exhibit 4.) Based on the testimony at the hearing, this agreement was meant to resolve a gambling debt Ligeri owed Tischer.[2] In it, Kangaroo conveyed trademarks and other intellectual property rights to Optimistic. (*Id.*) Ligeri testified that he did not remember signing the document and that he did not read the document. He also testified that he could have been under the influence when the document was signed, and that the notary's explanation when verifying that he signed the document was inconsistent. Finally, Ligeri testified that business between the parties was unchanged after the agreement was signed.

Certain intellectual property was later conveyed to Plaintiff Murphy in a "Settlement Agreement and General Release" executed between Optimistic, Kangaroo, Murphy, and Ligeri dated June 11, 2020. (Admitted as Plaintiffs' Exhibit 7.) Murphy testified that this agreement was intended to transfer Ultra-Glow Super Star trademarks and copyrights. Murphy also explained at the evidentiary hearing he always believed that he owned the copyrights to Ultra-Glow Super Stars. But he wanted to settle the issue, so he signed the "Settlement Agreement and General Release." Ligeri testified that the agreement was never

---

[1] The Court notes that the signatures on the documents are not dated by either party, but the notary later confirmed in writing that Ligeri signed the document on May 30, 2019.
[2] No witness gave precise details on the nature of the debt owed.

meant to assign copyrights and that the agreement was signed under duress. Ligeri testified that he believed that Murphy never owned the copyrights and that, notwithstanding their agreement, Ligeri is still the rightful owner of the copyrights.

The parties also entered into an "Asset Purchase Agreement" on July 1, 2019, where, while still acting as the COO of Cheyenne, John Burns sold the FBA King seller account and all of its intellectual property to Cheyenne for $240,000. (Admitted as Plaintiffs' Exhibit 38.) Burns testified that this was done because Ligeri owed him money. Ligeri testified that was not the case, and that Burns stole money from him. Later, Tischer, through Lightning Quick, bought Cheyenne in October 2021 at a bankruptcy auction. (Admitted as Plaintiffs' Exhibit 1 at ¶¶ 25–26; Admitted as Plaintiffs' Exhibit 14.) After Tischer purchased Cheyenne, Burns told him that Cheyenne still owed money on the FBA King "Asset Purchase Agreement." After paying off the remaining balance on the $240,000, Tischer took control of the FBA Account.

Another of these agreements is a "Copyright Assignment and Transfer Agreement" dated November 4, 2019. (Admitted as Plaintiffs' Exhibit 15.) This agreement appears to transfer ownership of copyrights from Kangaroo to Cheyenne for $15,000. (*Id.*) Defendant Ligeri testified that the document had been backdated and was actually drafted more than one year after the date listed. He testified that he did not file or record the documents, and that the $15,000 was never transferred from Cheyenne to Kangaroo, because a lawyer advised him that the transfer may constitute fraud.[3] Plaintiffs' counsel cross-examined Ligeri and showed him bank records indicating that $15,000 was transferred from Cheyenne's accounts to KBrands on November 4, 2019, but Ligeri answered that the transfer was unrelated and that it was just a coincidence that there was a $15,000 transfer that day. (Admitted as Plaintiffs' Exhibit 37.)

By June 30, 2020, Kangaroo was in Chapter 7 bankruptcy. (*See* Admitted as Plaintiffs' Exhibit 13.) In the federal bankruptcy proceeding, Kangaroo filed a document, signed by Ligeri, stating that it did not own any intellectual property, and that all

---

[3] Defendants' brief notes that Ligeri's "personal bankruptcy was already pending." (Doc. 24 at 10 n.3.) Thus, they conclude, such an attempt "would be legally void." (*Id.*)

- 3 -

intellectual property Kangaroo once owned had been sold to Optimistic in March 2019 and Jackson Hole, another entity Ligeri owned, in March 2020 for $150,000 and $50,000 respectively. (*Id.*) At the evidentiary hearing in this case, however, Ligeri testified that although he signed it, there were problems with the document. First, the figures on the forms were wrong. Second, he did not read the forms. And third, he did not know that the forms were submitted by his attorney with the incorrect numbers. He attributed this to a breakdown in communication between him and his attorney. As a result, he later fired his attorney. The schedules were never amended to correct this false representation to the bankruptcy court. Ligeri blamed his attorney for this error, and claims that he was a victim of legal malpractice.

On April 5, 2021, Plaintiff Murphy and Defendant Ligeri signed an "Asset Purchase Agreement" that transferred the Narwhal Novelties brand, Galaxy Brite brand, Lunar Phase brand, and associated intellectual property from Cheyenne to Murphy. (Admitted as Plaintiffs' Exhibit 35.) Murphy testified at the hearing that the agreement was meant to transfer copyrights from Ligeri and his company to Murphy. In contrast, Ligeri testified that the agreement only transferred trademarks, since Kangaroo, not Cheyenne, owned the copyrights.

In May of 2021, an "Amended Stipulated Permanent Injunction" was filed in an Arizona State Court case involving Optimistic, Cheyenne, and Ligeri. (Admitted as Plaintiffs' Exhibit 11.) The injunction validated Optimistic's claim of ownership of intellectual property from the May 30, 2019, agreement. (*Id.* ¶ 1.) The listed intellectual property in the injunction included trademarks, domain names, and universal product codes, but not copyrights. (*Id.* at 8–16.)

Starting in December of 2021, after Ligeri re-acquired Kangaroo, Defendants and their counsel began filing Amazon complaints claiming that Plaintiffs were selling products on Amazon in violation of Defendants' copyrights.[4] (Doc. 14 at 3; Admitted as Plaintiffs' Exhibit 1 at 9–10 ¶ 33; Admitted as Plaintiffs' Exhibit 2 at 4–5 ¶¶ 15, 17; Admitted as

---

[4] During his bankruptcy, Ligeri lost control of Kangaroo. He was able to buy back the company in December 2021.

Plaintiffs' Exhibit 3 at 2 ¶ 5.) All in all, Ligeri has filed about 210 Amazon complaints to date. Submitting an Amazon copyright complaint prompts Amazon to delist the challenged products until the parties resolve the issue.

On December 27, 2021, Plaintiffs filed this action, seeking a declaratory judgment regarding the ownership of copyright and trademark rights and monetary damages stemming from Defendants' violations of Plaintiffs' copyright and trademark rights. (*See* Doc. 1.) Plaintiffs also ask this Court to order Defendants to withdraw their pending Amazon complaints and to enjoin Defendants from filing additional Amazon complaints. (*See, e.g.*, *id.* at ¶¶ 76–77.)

## II.   LEGAL STANDARD

The standard for issuing a temporary restraining order is the same as that for issuing an injunction. *Immigrant Legal Res. Ctr. v. City of McFarland*, 472 F. Supp. 3d 779, 783 (E.D. Cal. 2020). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). For a court to issue a preliminary injunction, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). In the Ninth Circuit, even "if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

A mandatory injunction, unlike a prohibitory injunction, "orders a responsible party to take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996) (internal quotation marks omitted). This "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH &*

*Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (alterations in original) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980)). "Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879). And so, "'mandatory preliminary relief' is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (quoting *Anderson*, 612 F.2d at 1114).

## III. DISCUSSION

### A. Serious Questions Going to the Merits

Plaintiffs have the burden to show a substantial likelihood of success or serious questions going to the merits of their case. "The first element of a copyright-infringement claim is 'ownership of a valid copyright.'" *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, --- U.S. ---, 137 S. Ct. 1002, 1008 (2017) (citing *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991)). "A valid copyright extends only to copyrightable subject matter. The Copyright Act of 1976 defines copyrightable subject matter as 'original works of authorship fixed in any tangible medium of expression.'" *Id.* (internal citation omitted) (quoting 17 U.S.C. § 102(a)). "Before pursuing an infringement claim in court, however, a copyright claimant generally must comply with § 411(a)'s requirement that 'registration of the copyright claim has been made.' Therefore, although an owner's rights exist apart from registration, registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, --- U.S. ---, 139 S. Ct. 881, 887 (2019) (internal citations omitted).

The second element is "'copying of constituent elements of the work that are original.'" *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022) (emphasis omitted) (quoting *Feist*, 499 U.S. at 361). To prove direct infringement, the Ninth Circuit requires a party to

"establish causation, which is commonly referred to as the volitional-conduct requirement." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019) (internal quotation marks omitted). "'[V]olition in this context does not really mean an act of willing or choosing or an act of deciding;' rather, 'it simply stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *Id.* (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)). "Stated differently, '*direct* liability must be premised on conduct that can reasonably be described as the direct cause of the infringement.'" *Id.* To prove this, "a party . . . must provide some evidence showing the alleged infringer exercised control other than by general operation of its website; selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution of its photos." *Id.* (cleaned up).

The parties do not dispute that the images and packaging are copyrightable. They do, however, dispute who owns the copyrights and whether there was copying.

Plaintiffs argue that Defendants are judicially estopped from arguing that they own the copyrights because they made representations in bankruptcy court that all the intellectual property Kangaroo owned had been assigned to other parties. (Doc. 32 at 2–3; *see* Doc. 14 at 6–7.) Specifically, the schedules explained that Kangaroo had sold all of its intellectual property to Optimistic Investors and Jackson Hole. (Admitted as Plaintiffs' Exhibit 13.) They also argue that Lightning owns some of Kangaroo's intellectual property after buying Cheyenne for $15,000. (Doc. 14 at 7.) Murphy argues that he created, and therefore owns, the copyrights for Ultra-Glow Super Stars. (*Id.* at 8.) Plaintiffs further argue that the intellectual property related to Ultra-Glow Super Stars "was among the works that were assigned from Kangaroo Manufacturing to Cheyenne Brands in the November 4, 2019" agreement. (*Id.*) Plaintiffs also note that Defendants have made numerous complaints to Amazon about products for which there are no recorded copyrights. (*Id.* at 4, 8–9.)

Plaintiffs also argue that no copying occurred because Amazon's system

"automatically routes sellers of given products to existing images previously posted by other sellers regarding those products." (Doc. 14 at 6; *see* Doc. 32 at 9.) Thus, they have not engaged in any misconduct because "Amazon adds all subsequently-registering sellers to the existing Amazon webpage for that particular product which displays those previously-posted photos or artwork." (Doc. 14 at 10.) In Plaintiffs' view, they play a passive role in all of this, and "have done nothing to copy those works." (Doc. 14 at 6, 11; *see* Doc. 32 at 9.) Finally, even if Defendants are found to own the copyrights and infringement occurred, Optimistic argues that it operated with an irrevocable implied license to use Defendants' copyrighted packaging. (Doc. 14 at 11.)

Defendants argue that the November 4, 2019, agreement does not transfer any intellectual property because: it was not actually executed; it was originally drafted much later than November of 2019 and then backdated; no property was ever transferred to Cheyenne from Kangaroo; and the required $15,000 payment was not made. (Doc. 24 at 9–11.) Defendants assert that there is no implied license because their sale and Plaintiffs' purchase of their product "does not grant any right to use copyrights." (*Id.* at 11.) Defendants also argue that Murphy's claims to copyright ownership fail because Murphy only came up with ideas and concepts, which are not copyrightable. (*Id.* at 11–12.) Defendants maintain that Plaintiffs are the copyright infringers and therefore unlikely to succeed on any of their claims.[5] (*Id.*)

### 1. Judicial Estoppel

"'Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position.'" *Grondal v. United States*, 21 F.4th 1140, 1151 (9th Cir. 2021) (quoting *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)). Judicial estoppel is "invoked by a court at its discretion" to "protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (internal

---

[5] In closing arguments, Defendants' counsel argued that paragraph 14 of the June 11, 2020, agreement is a California exclusive jurisdiction clause which should be controlling in this case. Thus, they argued, any claims to the agreement should be dismissed for lack of jurisdiction. This issue was not briefed and will not be considered at this time.

- 8 -

quotation marks and citations omitted).

Here, the Court "appl[ies] judicial estoppel 'against the backdrop of the bankruptcy system and the ends it seeks to achieve.'" *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (citing *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir.1999)). "These ends are to 'bring about an equitable distribution of the bankrupt's estate among creditors holding just demands,' and to 'grant a fresh start to the honest but unfortunate debtor.'" *Id.* (internal citations omitted) (quoting *Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 227 (1930); *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)). "Therefore, judicial estoppel must be applied in such a way as to deter dishonest debtors, whose failure to fully and honestly disclose all their assets undermines the integrity of the bankruptcy system, while protecting the rights of creditors to an equitable distribution of the assets of the debtor's estate." *Id.*

The Ninth Circuit has set forth three factors that courts should consider when deciding a judicial estoppel issue:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 40 (9th Cir. 2022). Moreover, "[i]n enumerating these factors, [the Ninth Circuit] do[es] not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." *Id.*

Here, Plaintiffs' arguments for applying judicial estoppel are strong—Ligeri did not

list any other intellectual property on Kangaroo's bankruptcy forms but now claims that Kangaroo did in fact own intellectual property not listed, namely many of the copyright rights now at issue. But Ligeri argues that he never read the forms, that he discussed the issue with his attorney, and that he trusted his attorney to ensure the forms accurately reflected the intellectual property that Kangaroo owned, which included copyrights.

When assessing the likelihood of success of these arguments, Ligeri's argument assumes that legal malpractice occurred. Beyond his own testimony, there is no evidence in the record supporting Ligeri's position. In the 2020 bankruptcy filing, he signed a document clearly stating that Kangaroo owned no intellectual property. At the evidentiary hearing, on the other hand, he testified that Kangaroo did have copyrights during the bankruptcy proceeding. These positions are obviously inconsistent, and the first condition is satisfied. The second condition is also clearly met, as the bankruptcy court accepted Ligeri's filing and the trustee was not able to sell the rights to Kangaroo's intellectual property when auctioning Kangaroo's property to satisfy its creditors. The third condition is also met because Plaintiffs relied on Kangaroo's representation in bankruptcy when determining that they owned the copyrights and could sell the subject products on Amazon.

The Court pressed Plaintiffs' counsel about what would happen to the copyrights' enforceability if Ligeri *did* own the rights, his lawyer committed malpractice, and he simply made a filing mistake in bankruptcy court. For example, have Ligeri's rights simply disappeared, do Plaintiffs' now own them, or have they slipped into the public domain? Plaintiffs' counsel answered that Ligeri would own the rights, but he would be unable to enforce them. The Court is not convinced that this is true in all circumstances, but finds the argument that Ligeri would not be able to enforce his copyrights in this specific case convincing. Given the record before the Court, it is highly improbable that Ligeri's tale of legal malpractice is true. Ligeri has a spotty record of truthfulness, appears to have considered a potentially fraudulent transfer during bankruptcy proceedings, and claims to not read legal documents that he signed. The facts of this case spin a tangled web of agreements and side deals between friends and business partners turned enemies. Both

sides claim to be in the right; however, with the evidence currently before it, the Court finds Ligeri's characterization of the facts almost impossible to believe. In the context of Plaintiffs' judicial estoppel argument, the Court finds that Plaintiffs have demonstrated that there exists a substantial likelihood that they would succeed on the merits that they are the rightful owners of the copyrights.

### 2. Optimistic's, Murphy's, and OIG's Ownership Arguments

In addition to their judicial estoppel argument, Optimistic, Murphy, and OIG raise five additional arguments regarding the rightful ownership of the copyrights.

Plaintiffs' contention that there are no recorded copyrights for some of the products where Amazon complaints have been filed, even if true, does not show they are likely to succeed on the merits. Because copyrights must be registered before a party sues to enforce those rights, Plaintiffs' argument would be a strong defense against Defendants' counterclaims. But it does nothing to establish that they are the rightful owners of any copyrights. Registration is not required for a party to own copyrights or file Amazon complaints. Moreover, as Ligeri testified, Plaintiffs cannot claim that Ligeri has made false representations to Amazon when filing copyright complaints, as Amazon does not require proof of registration to file a valid complaint. Thus, Plaintiffs have not raised serious questions going to the merits of the case on this issue.

Plaintiffs' implied license argument is similarly weak. Plaintiffs bought products from Kangaroo and then sold them on Amazon. While they were buying products from Kangaroo, Kangaroo allowed them to use their copyrighted images on Amazon and their copyrighted product packaging. Clearly, when purchasing a product from a supplier, it does not mean the buyer has also bought the buyer's copyrights. Any consumer who buys a new copy of *Bambi* on Blu-Ray or *Disney Villainous* knows that he can resell that specific product to whomever he pleases.[6] But he also knows that the purchase of that one item does not mean that he has the right to reproduce that movie or board game, and its packaging, whenever he pleases. Moreover, it is obvious he that cannot sell this newly

---

[6] *Disney Villainous* is a trendy board game where players play as popular Disney movie villains.

created, bootlegged product on the open market. Thus, Plaintiffs have not raised serious questions going to the merits of the case regarding their implied license argument.

Plaintiffs' ownership claims based on the "Copyright Assignment and Transfer Agreement" dated November 4, 2019, raise serious questions going to the merits of this case. Cheyenne transferred $15,000 to Kbrands on November 4, 2019. This would usually be strong circumstantial evidence to support the argument that the intellectual property transfer did happen. But Ligeri admitted that the Copyright Assignment and Transfer Agreement was created with fraudulent intent, backdated to November 4, 2019, and never actually executed. The Court finds it likely that Ligeri picked that date *because* there was a bank record of a transaction for that exact amount on that date from Cheyenne to Kbrands. Moreover, as Defendants point out in their brief, a transfer while his personal bankruptcy was pending would be impossible. (Doc. 24 at 10 n.3.) However, Ligeri's testimony demonstrated that he is not inclined to truthfulness, even before a court. Thus, this Court finds that Plaintiffs' claims based on the "Copyright Assignment and Transfer Agreement" dated November 4, 2019, raise serious questions going to the merits of this case, but do not show a substantial likelihood of success on the merits.

The creation and design of the Ultra-Glow Super Stars packaging and pictures is hotly contested. Murphy testified that Ligeri promised him the copyrights during a pitch meeting for a workshop. At that workshop, Murphy came up with the first designs for the design of the Ultra-Glow Super Stars packaging. Murphy also testified that the phrase "[w]ho owns it? You own it," during the pitch meeting was a promise that he would own the copyrights for his product. (Admitted as Plaintiffs' Exhibit 29.) But a closer look at the transcript of the pitch meeting and Ligeri's testimony clarifies that such an interpretation could be taking the phrase out of context. Read with just a little more context, the quote becomes, "[w]ho owns it? You own it. It's your inventory." The argument that the agreement was for ownership of inventory and not intellectual property is strengthened by the fact that Ligeri's employees were the ones who fixed Murphy's idea in a tangible form. Murphy argued that this could lead to co-authorship of the designs, but Ligeri testified that

1 his employees did all the work, that Murphy's design was not really used when creating the packaging, and that Ligeri's employees took the photographs without input from Murphy. On balance, this Court finds that Murphy has raised serious questions going to the merits of this case, but has not shown a substantial likelihood of success regarding the authorship of the Ultra-Glow Super Stars copyrights.

Finally, at the evidentiary hearing, Ligeri testified that the copyright claims against OIG's KN95 mask listings were likely, if not certainly, unsubstantiated. His counsel argued that damages to OIG were limited because the mask listing was only down for one day. Regardless of the amount of damages, Ligeri and his counsel do not contest that the Amazon complaints filed against OIG's KN95 mask listings were not warranted. Thus, on the KN95 mask issue, the Plaintiffs have clearly proved a substantial likelihood of success on the merits.[7]

Thus, even setting aside the arguments for judicial estoppel, Plaintiffs have raised serious questions going to the merits of their case.

### B. Balance of Hardships

Once Plaintiffs have shown a substantial likelihood of success on the merits, then they must "'establish . . . that the balance of equities tips in [their] favor.'" *Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1052 (quoting *Winter*, 555 U.S. at 20). If Plaintiffs have only shown that there are serious questions going to the merits of this case, then they must demonstrate that "the 'balance of hardships tips *sharply* in [their] favor.'" *Shell Offshore Inc.*, 709 F.3d at 1291 (quoting *All. for the Wild Rockies*, 632 F.3d at 1135). When balancing the hardship that each party would suffer, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

Plaintiffs argue that they will be financially ruined if a TRO is not put into place

---

[7] Ligeri testified that he believes "this is a war." He went on to explain that he seems himself as "the Allies" and that Plaintiffs as "Adolf Hitler." Thus, the Court does not find this issue moot for purposes of this TRO because Ligeri could easily refile Amazon complaints about the KN95 masks.

- 13 -

because their businesses cannot survive Defendants' barrage of Amazon complaints. (Doc. 14 at 13–14.) On the other hand, they argue, Defendants will suffer no harm if this Court enters a TRO. (*Id.* at 14.) If a TRO is not put into place, Defendants argue that Plaintiffs' only hardship would be "the cost of replacement photographs, artwork, and packaging." (Doc. 24 at 16; *see id.* at 16–17.) If a TRO prevented them from filing complaints with Amazon, Defendants argue that they would be helpless to prevent counterfeiters from destroying "the integrity of their online offerings," suffering an effective invalidation of their copyrights. (*Id.* at 16; *see id.* at 16–17.) Plaintiffs counter that Defendants' Amazon complaints "serve[] no purpose but revenge" because Defendants "cannot afford to acquire and resell the goods which are the subject of his Amazon complaints." (Doc. 34 at 11.) The TRO, they reemphasize, would simply allow them to maintain their businesses and stop Defendants' vengeful tactics. (*Id.*)

The balance of hardships tips sharply in Plaintiffs' favor. If a TRO is not put in place, they will lose their businesses and their livelihoods. A TRO would also ruin the livelihoods of their employees. Additionally, Defendants are seemingly insolvent. If a TRO is not put in place and Plaintiffs are later determined to be the rightful copyright owners, they will be unable to collect money damages from Defendants—a Pyrrhic victory. By contrast, Plaintiffs are solvent. While it is true that Defendants will lose the ability to protect their alleged copyrights from being used by Plaintiffs on Amazon, Defendants have already filed counterclaims in this lawsuit.[8] When the dust settles, if Defendants are determined to be the rightful copyright owners, there is a legal structure in place to adequately compensate them for their injuries. Allowing Plaintiffs to continue their businesses after posting a bond will ensure that Defendants will be able to collect the damages that they are owed if victorious in court. Therefore, if a TRO is filed, Defendants would suffer almost no harm. But, if a TRO is not filed, Plaintiffs would suffer catastrophic losses. Thus, the balance of hardships tips sharply in Plaintiffs' favor.

---

[8] Defendants noted at the evidentiary hearing that they plan to file an amended counterclaim. The Court does not yet know the anticipated new allegations or claims of the amended counterclaim.

### C. Irreparable Injury

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The Ninth Circuit has held that "a district court has authority to issue a preliminary injunction where the plaintiffs can establish that money damages will be an inadequate remedy due to impending insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating assets to avoid judgment." *In re Est. of Ferdinand Marcos, Hum. Rts. Litig.*, 25 F.3d 1467, 1480 (9th Cir. 1994). This exception is "restricted to only *extraordinary* cases in which equitable relief is not sought." *Id.*

But the Ninth Circuit "ha[s] [also] long held that irreparable harm can be presumed in a copyright infringement case upon a showing of a likelihood of success on the merits by the copyright owner." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011). Moreover, the Ninth Circuit also recognizes "that '[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm,' so long as there is concrete evidence in the record of those things." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018) (quoting *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)).

Plaintiffs argue that without this TRO, they will be unable to sell their product and will, within no time, go out of business. (Doc. 14 at 12; Doc. 32 at 9–11.) Because Defendants are insolvent, Plaintiffs assert that they would be unable to collect money damages. (*Id.*) Thus, they argue, a TRO is appropriate. (*Id.*) Defendants argue in response that Plaintiffs have not shown that irreparable harm is likely. (*See* Doc. 24 at 13–15.) They maintain that *In re Estate of Ferdinand Marcos*, 25 F.3d at 1480, prevents a finding of irreparable harm because they are seeking equitable relief and there is nothing extraordinary about the facts of this case. (*Id.*) Defendants also assert that Plaintiffs have "vastly overstated their claimed harm absent an injunction" in this case because they will only suffer money damages. (*Id.* at 15–16.)

There is a risk of irreparable harm here. The *In re Estate of Ferdinand Marcos* test

is a specific exception that applies when there is an insolvent party, but it can only be applied when a party is only seeking monetary damages. Plaintiff's claims fail the *In re Estate of Ferdinand Marcos* test because they seek equitable relief <u>and</u> money damages. Thus, although the Defendants' alleged insolvency makes it difficult for the Plaintiffs' to expect they will be able to actually collect money damages in the future, it is irrelevant when determining if there is irreparable harm.

But Plaintiffs have demonstrated a likelihood of success on the merits regarding their claim for judicial estoppel. This triggers the presumption of irreparable harm found in copyright infringement cases. The Court flatly disagrees with Defendants' argument that Plaintiffs have overstated the harm they would suffer without an injunction. *Supra* Section III.B Thus, Defendants offer no argument to rebut the presumption or irreparable harm in this case. Finding no reason to not apply the presumption, the Court finds that irreparable harm may be presumed.

But even without the presumption, Plaintiffs have demonstrated that the loss of goodwill towards their consumer bases on Amazon and their loss of control over their products' reputation is irreparable. All three Plaintiffs testified that taking down the pages for different products on Amazon damages the products' marketability in both the short and long term, and possibly permanently. Average star rating reviews, special banners, and high traffic metrics are lost, sometimes forever, when products are taken down from Amazon for too long. Additionally, the perceived availability and reliability of those products is tarnished when they are routinely appearing and disappearing from Amazon. Thus, Plaintiffs have demonstrated a sufficient risk of irreparable harm to justify a TRO.

### D. Public Interest

In contrast to the balance of hardships factor, which focuses on hardship facing the parties, the public interest factor "addresses [the injunction's] impact on non-parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002).

Plaintiffs argue that the public has an interest in unimpeded commerce on Amazon and similar platforms. (Doc. 14 at 13–14.) Defendants respond that commerce is subject to

the law governing intellectual property rights, and the public has "a compelling interest in protecting copyright owners' rights," and maintaining "the economic incentive . . . that accompanies" copyrights. (Doc. 24 at 17; *see* Doc. 24 at 17.) This is particularly true, they contend, because these interests are explicitly articulated in the U.S. Constitution. (*Id.* at 17.) Plaintiffs counter that the legal rights of the parties have not yet been determined and, accordingly, these public interests, while important, are irrelevant at this juncture. (Doc. 34 at 11.) In their view, a TRO would allow them to continue to work while ownership of the disputed copyright rights is resolved. (*Id.*)

The Court finds that the public interest favors granting a TRO. Given the evidence before the Court, the true owner of these copyrights is "a riddle wrapped in a mystery inside an enigma."[9] Thus, Defendants' claimed interest in protecting their copyrights from counterfeiters is no more compelling than Plaintiffs' claimed interest in using their copyrights in the open market. The public, however, clearly has an interest in free-flowing commerce unencumbered by vengeful and anti-competitive litigation. Ligeri testified that "this is a war" with Plaintiffs over the disputed copyrights. Refusing to issue a TRO would allow Ligeri's scorched-earth tactics to continue. This would lead to an inhibited and less competitive market, which would harm consumers.

Moreover, by now claiming that Kangaroo never sold its intellectual property, Ligeri tacitly admits to defrauding a bankruptcy court and Kangaroo's judgment creditors. The public has a strong interest in encouraging parties to be candid in judicial proceedings. There is also a strong public interest in the finality of court judgments and in maintaining the integrity of, and the public's confidence in, our court system. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Allowing a party to block a TRO by claiming it made inaccurate representations in a bankruptcy proceeding would violate these interests and injure the public's trust in our court system.

---

[9] "[S]tatement made by Winston Churchill about the Soviet Union in October 1939 after the signing of the Nazi-Soviet Pact and the beginning of World War II." *See A riddle wrapped in a mystery inside an enigma -- Churchill*, LIBRARY OF CONGRESS, https://www.loc.gov/item/2016683579/ (last visited Apr. 21, 2022).

### E. Mandatory Injunction

A mandatory injunction "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (quoting *Anderson*, 612 F.2d at 1114). Whether the "status quo pendente lite" is Plaintiffs' products off of Amazon or their products on Amazon is up for debate. Thus, whether Plaintiffs have even requested a mandatory injunction is not settled. Regardless, the Plaintiffs here have met their burden for a mandatory injunction. The merits of this case are not doubtful and the facts and law clearly favor the Plaintiffs thanks to their judicial estoppel argument which demonstrates a substantial likelihood of success on the merits. And, as this Court has already determined, extreme or very serious damage which cannot be compensated with money damages will result if a TRO is not put in place. *Supra* Section III.B–C.

### F. Bond

Under Federal Rule of Civil Procedure 65(c), a court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This language appears mandatory, but "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). And so, "'[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.'" *Id.* Here, there is a nonzero chance that Defendants will prevail and be named the rightful owners of the copyrights in question. They will have been harmed by the Court's injunction. Defendants request a bond of at least $170,000. The Court will require a bond in the amount of $170,000.

### G. Duration of TRO

A TRO issued without notice may not exceed 14 days. Fed. R. Civ. P. 65(b)(2). For good cause, however, the duration of a TRO issued without notice may be extended for an

additional 14 days once. *Id.* "When a temporary restraining order is issued with notice and after a hearing, however, the 14-day limit for such orders issued without notice does not apply." *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1223 n.1 (D. Or. 2016). Thus, the Court has discretion, in entering a TRO with notice, over the appropriate duration. "Nevertheless, absent consent of the parties, '[a] court may not extend a 'TRO' indefinitely, even upon notice and a hearing.'" *Id.* (quoting *Horn Abbot Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 368 n.12 (N.D.Ill.1984)). Accordingly, this TRO shall extend for 31 days.

### H. Order to Show Cause

Plaintiffs have also requested that this Court issue an order to show cause why a preliminary injunction should not be issued. (Doc. 14.) The burden of demonstrating that a preliminary injunction is necessary falls on the party seeking the injunction, not the party whom the injunction would restrict. *See supra* Section II. Thus, the Court will not issue an order to show cause why a preliminary injunction should not be issued, but this is without prejudice to later filing a motion for preliminary injunction.

### IV. CONCLUSION

Accordingly,

**IT IS ORDERED granting in part** and **denying in part** the Application for Issuance of Temporary Restraining Order With Notice And Request for Issuance of an Order to Show Cause Why a Preliminary Injunction Should not be Issued (Doc. 14).

**IT IS FURTHER ORDERED** that Defendants, their agents, attorneys, companies, and assigns are prohibited from filing Amazon copyright complaints regarding any of the products at issue in this case for 31 days from the date of this Order. (Admitted as Plaintiffs' Exhibit 18; Admitted as Defendants' Exhibit 107.)

**IT IS FURTHER ORDERED** that Defendants, their agents, attorneys, companies, and assigns shall withdraw all Amazon copyright complaints regarding any of the products at issue in this case for 31 days from the date of this Order. (Admitted as Plaintiffs' Exhibit 18; Admitted as Defendants' Exhibit 107.)

**IT IS FURTHER ORDERED** that Plaintiffs shall post bond at $170,000.

**IT IS FURTHER ORDERD** that the Court will not issue an Order to Show Cause Why a Preliminary Injunction Should not be Issued, but this does not preclude Plaintiffs from filing a motion for preliminary injunction.

**IT IS FINALLY ORDERED** that Plaintiffs' deadline to file a motion for preliminary injunction shall be **April 28, 2022**. Defendants shall have until **May 5, 2022**, to respond. Plaintiffs shall have until **May 9, 2022** to file their reply. Hearing on the motion for preliminary injunction is set for **May 10, 2022**, at 8:30 AM in Courtroom 504 401 West Washington Street, Phoenix, AZ 85003 before Judge Michael T Liburdi.

Dated this 22nd day of April, 2022.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge